[Cite as *Schoolcraft v. Schoolcraft*, 2012-Ohio-4148.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|                        |   |                          |
|------------------------|---|--------------------------|
|                        | : | JUDGES:                  |
| BENJAMIN SCHOOLCRAFT    | : | Patricia A. Delaney, P.J. |
|                        | : | W. Scott Gwin, J.         |
| Plaintiff-Appellee     | : | Julie A. Edwards, J.      |
|                        | : |                          |
| -vs-                   | : | Case No. 2011CA00240      |
|                        | : |                          |
|                        | : |                          |
| MELANIE SCHOOLCRAFT    | : | O P I N I O N            |
|                        |   |                          |
| Defendant-Appellant    |   |                          |

CHARACTER OF PROCEEDING: Civil Appeal from Stark County
Court of Common Pleas, Domestic
Relations Division, Case No.
2011-DR-00330

JUDGMENT: Affirmed

DATE OF JUDGMENT ENTRY: September 10, 2012

APPEARANCES:

For Plaintiff-Appellee

JEFFREY JAKMIDES
325 East Main Street
Alliance, Ohio 44601

For Defendant-Appellant

LANCE D. GILL
3570 Executive Drive, Suite 102
Uniontown, Ohio 44685

*Edwards, J.*

**{¶1}** Defendant-appellant, Melanie Schoolcraft, appeals from the September 26, 2011, Final Entry Decree of Divorce issued by the Stark County Court of Common Pleas, Domestic Relations Division.

## STATEMENT OF THE FACTS AND CASE

**{¶2}** Appellant Melanie Schoolcraft and appellee Benjamin Schoolcraft were married on August 30, 2003. They are the parents of two children, namely, McKenzie (DOB 1/15/03) and McKaela (DOB 10/7/06).

**{¶3}** On March 17, 2011, appellee filed a complaint for divorce against appellant. Pursuant to a Magistrate's Order filed on April 6, 2011, appellee was designated temporary residential parent of the children and appellant was granted visitation.

**{¶4}** A trial was held on August 31, 2011 on the issue of custody of the children. At the trial, Heather Smith, the Guardian Ad Litem, testified that she recommended that appellee be designated the residential parent for school purposes and that appellant have visitation. Smith testified that the parties had communicated well with one another initially, but that the communication had deteriorated over the last year. She also testified that when she spoke with McKenzie's teacher, the teacher told her that she did not have contact with appellant at all during the last year and that appellant did not attend parent-teacher conferences or any school activities. According to Smith, the teacher told her that appellee attended the conferences, was active with the class and would help with parties and that appellee was very active with McKenzie and would sign off on her homework.

{¶5} Smith further testified that she found the children's living arrangement with appellee appropriate and that it was not a bad environment for the children. She testified that when she visited appellee's home, she did not smell smoke in the main living areas, but did smell smoke in the children's grandmother's room. According to Smith, she addressed such issue with appellee. Smith also testified that McKenzie, who was just completing the second grade, read at a fourth grade level. She attributed this to the fact that appellee had McKenzie read every night.

{¶6} During her testimony, Smith indicated that she had concerns with both parties over the fact that the children were not up to date on doctor appointments and immunizations. She further testified that appellee coached McKenzie's soccer team and was on the board for the soccer league. She indicated that she did not believe that appellant was currently involved in any of the children's extracurricular activities.

{¶7} On cross-examination, Smith testified that appellee could not attend some of the children's events that were held during the day because they conflicted with his work schedule. She testified that appellee and the children lived with his mother and her husband, his two sisters, his brother-in-law and one of his sister's sons. While the house has three bedrooms, the attic is divided into two areas that are used as bedrooms.

{¶8} Smith testified that she knew that appellee's mother was a smoker, but did not know if the other adults in the home were. She indicated that appellee's mother's bedroom smelled of smoke and that she did not see any ashtrays around the house. Smith indicated that she did not believe that appellant was inappropriate with her children.

{¶9}   The following testimony was adduced when Smith was asked about her recommendation that appellee be designated the residential parent:

{¶10} "A. Father is very school oriented.  You can tell that that is important to him for his children.  He's been actively parenting the children.  Um…both in school as well as the extracurricular activities.  Um…it, I know that mother had proposed that if it was week to week, that they could relocate to Louisville.  She's not there.  Quite frankly, forty minutes away is way too far to be transporting children back and forth to school. I'm not okay with that.  Um…father has stepped up to the plate and shown that he…not only can part, have the children participate and be a part of extracurricular activities, school is very important to him."  Transcript at 31.

{¶11} Smith further testified that she disagreed that appellant's work schedule and physical distance from the children explained her inability to participate in the children's activities. She noted that appellant could pick up a telephone and call the teacher and that parent-teacher conferences were held twice a year. The following is an excerpt from her testimony:

{¶12} "Q. Okay.  Well, I'm, the point I'm making is, is that since the father lives with them and has been living with them, since at least October of 2010, when she [appellant] moved to Cuyahoga Falls, that he's had the opportunity in a day to day basis to be involved in their day to day activities and that's simply because of the way it is? And since the temporary orders, he's the only one that's had a reasonable opportunity to do that.  Isn't that true?

{¶13} "A. What I am saying is that, yes he has worked with the children regularly.  He is also gone to their activities.  Participated in parent-teacher conferences

and extracurricular activities. This past year, mother has done none of those things. She has had the children every weekend. McKenzie used to be in gymnastics. If she had the children every weekend until the temporary orders hearing, she could have put McKenzie in gymnastics. But she chose not to. She could have called the school and arranged for her own parent-teacher conference. Or to speak to the teacher on the telephone to see how her child was doing. She did not. She has not been pro-active." Transcript at 34.

{¶14} At the trial, appellee testified that he had made an appointment to catch McKaela up on her shots and that he needed to make a wellness appointment for McKenzie, who was caught up on her shots. He further testified that his mother was the only smoker in the house and that she had smoked in her bedroom until the Guardian Ad Litem issued her report. According to appellee, since that time, she has not smoked in the house. Appellee testified that he was active in school, attended parent-teacher conferences, monitored the children's grades and performances and required McKenzie to read. He also testified that McKaela was able to read because he worked with her on a daily basis.

{¶15} On cross-examination, appellee testified that on Mondays through Fridays, he usually leaves the house for work at around 3:40 a.m. and gets out of work by 12:30. He testified that during soccer season, he has Saturdays off and that he works from 6:00 a.m. to 2:00 p.m. on Sundays. When it is not soccer season, appellee works Saturdays if needed. Appellee testified that he works around fifty hours a week and that while he is at work, the children are cared for by his mother.

**{¶16}** At the trial, appellant testified that when she and appellee were living together as husband and wife, they were living with the same people that appellee was living with at the time of the trial, with the exception of the one child who was not yet born. She testified that appellee's mother was a chain smoker and had been a smoker for more than 12 years and that appellee's stepfather also was a heavy smoker. She testified that appellee's brother in-law, who lived in the house, was a smoker as well. According to appellant, the ashtrays in the house were always full and, during the summer months, they used fans that would blow ashes and smoke all around the house. Appellant testified that she did not smoke, that her roommate did not smoke and that she did not have people come to her house on a regular basis who were smokers.

**{¶17}** Appellant testified that during the last two and a half years that she was living with appellee as husband and wife, appellee was working the same job. She testified that appellee would go to bed around 7:00 p.m. or 8:00 p.m. and would get up around 3:00 or 3:30 a.m. and that his interaction with his family at the time was minimal. She further testified that when she would pick up the children after the parties separated, the children's hair and clothes smelled of smoke. Appellant also testified that she moved to the Akron-Cuyahoga Falls area in October of 2010, to be closer to her job as a waitress. She testified that she works Monday through Friday from 10:45 a.m. until 2:45 p.m. She also testified that she had spoken with her employer and that, if she was named residential parent, when the children were not in school, he would work around her schedule. According to appellant, while she was working during the summer, either her roommate or in-home child care would care for the children. When the children were

in school, appellant typically would leave the home for work at 10:30 a.m. and return by 3:00 p.m.

{¶18} Dr. Bradley Everly, a medical doctor with a master's degree in public health, testified at trial regarding the dangers of second and third hand smoke[1] to children. The following was adduced when he was questioned about the effects of smoke on children under the age of ten:

{¶19} "Q. Um…how would these um…how would the exposure be manifest themselves in, in children um…when you talk about infections or illnesses? I mean, what kind of things are we talking about?

{¶20} "A. The most common illness that, that I see as a family physician that's related to smoke exposure would be otismedia, or inner ear infection. The inner ear infection that typically we see in children that is non-smoke related tends to peak at about the age of two years old and then as children grow and the structure of their ustation (sic) tube, which is the tube that connects the inner ear to the back of the oral pharynx in order to regulate pressure so that your ears don't pop. Um…as that orientation changes past the age of four, it becomes rapidly very rare to see ear infections, unless there is some degree of chronic inflammation related to something in the environment. The most common thing in the environment that cause chronic inflammation that would lead to ear infection past the age of four, would be un…second hand smoke.

{¶21} "Q. And is there any other illness that would make you suspicious if the child has been suffering from this exposure?

---

[1] Dr. Everly defined third hand smoke as smoke that is no longer actively in the air, but has deposited on surfaces.

{¶22} "A. Chronic bronchitis, which bronchitis is essentially defined as inflammation of the bronchis [sic]. So, chronic bronchitis, which is chronic inflammation of the main airway below the vocal cords is um…related to second hand smoke exposure. There are other things that can cause bronchitis but in order to achieve a chronic bronchitis, there needs to be a chronic irritant and the majority of these cases that I'm familiar with are from second hand smoke.

{¶23} "Q. So, if a child is presented to you with an inner ear infection as the age of eight, let's say. Then what would your normal process be and at diagnosing what the problem is?

{¶24} "A. Any child of that age that comes in with an acute otismedia or inner ear infection would be questioned about exposure to tobacco smoke because that is the most likely cause in a child that age. The other things that I would question is whether or not there's any known structural defect in the anatomy of the child, which should manifest itself well before the age of eight years old. If there is smoking exposure, and we have a chronic, or a, I'm sorry, an acute otismedia, then that changes the treatment because the bacteria that we have to cover for our more pathogenic and more resistant to antibiotics that the patient who is exposed to second hand smoke. Over the past decade, we've come up with some immunizations for some of the bacteria that commonly caused otismedia and because of those immunizations, again it's very rare to see an acute ear infection in an eight year old who is not exposed to second hand smoke or some chronic irritant." Transcript at 67-68.

{¶25} Dr. Everly testified that exposure to smoke could not be ameliorated by limiting smoking to one room in the house.

{¶26} During his testimony, Dr. Everly admitted that he had not seen the children in this case personally, but testified that he had reviewed their medical records. He testified that McKenzie had been diagnosed in March of 2011 with acute otismedia (an inner ear infection) and acute bronchitis and that it was relatively uncommon for a child past the age of four to have acute otismedia without exposure to an environmental irritant. He also testified that the acute bronchitis was related to some environmental irritant. With respect to McKaela, Dr. Everly testified that she was diagnosed in March of 2011 with an acute respiratory infection. However, he indicated that he disagreed with such diagnosis because the symptoms, a cough and rhinitis, had existed for three weeks. In his opinion, the diagnosis was more likely a chronic upper respiratory illness caused by environmental irritant exposure.

{¶27} On cross-examination, Dr. Everly admitted that nothing in the medical records history indicated that the children had been exposed to second hand smoke. He testified that there were thousands of other environmental irritants.  Dr. Everly had never visited appellee's home and had only interviewed appellant.

{¶28} Pursuant to a Final Entry Decree of Divorce filed on September 26, 2011, the trial court designated appellee as the residential parent and legal custodian of the children and granted appellant visitation.

{¶29} Appellant now raises the following assignment of error on appeal:

{¶30} "THE TRIAL COURT ERRED TO THE PREJUDICE OF THE APPELLANT WHEN IT DESIGNATED THE APPELLEE AS THE RESIDENTIAL PARENT AND LEGAL CUSTODIAN OF THE PARTIES' MINOR CHILDREN."

I

**{¶31}** Appellant, in her sole assignment of error, argues that the trial court erred in designating appellee as the residential parent and legal custodian of the children. We disagree.

**{¶32}** Because custody issues are some of the most difficult and agonizing decisions a trial judge must make, he or she must have wide latitude in considering all the evidence and such decision must not be reversed absent an abuse of discretion. *Davis v. Flickinger*, 77 Ohio St.3d 415, 418, 1997-Ohio-260, 674 N.E.2d 1159 (Citation omitted). "The term 'abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore,* 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). In *Bechtol v. Bechtol*, 49 Ohio St.3d 21, 550 N.E.2d 178 (1990) the Ohio Supreme Court held: "Where an award of custody is supported by a substantial amount of credible and competent evidence, such an award will not be reversed as being against the weight of the evidence by a reviewing court." *Id.* at syllabus. The reason for this standard of review "is that the trial judge has the best opportunity to view the demeanor, attitude, and credibility of each witness, something that does not translate well on the written page." *Davis,* supra at 418. "A reviewing court should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the trial court. A finding of an error in law is a legitimate ground for reversal, but a difference of opinion on credibility of witnesses and evidence is not." *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 81, 461 N.E.2d 1273 (1984).

{¶33} In allocating parental rights and responsibilities, the trial court must consider the best interest of the children. R.C. 3109.04(F)(1) sets forth the factors a trial court must consider when making such a determination, and reads, in pertinent part:

{¶34} "In determining the best interest of a child pursuant to this section, * * *, the court shall consider all relevant factors, including, but not limited to: (a) The wishes of the child's parents regarding the child's care; (b) If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court; (c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest; (d) The child's adjustment to the child's home, school, and community; (e) The mental and physical health of all persons involved in the situation; (f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights; * * * (i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court; (j) Whether either parent has established a residence, or is planning to establish a residence, outside this state."

{¶35} Appellant, in her brief, argues that the trial court abused its discretion in designating appellee residential parent because the children were victims of second and third hand smoke exposure while residing with appellee and his extended family and their health was at risk. No one disputes the dangers of exposure to second hand smoke to the children.  However, there was conflicting testimony as to the level of

exposure. While appellant testified that appellee's mother, step-father and brother all were smokers and that the children smelled of smoke, appellee testified that after the Guardian Ad Litem issued her report, he told his mother that she would have to quit smoking in her bedroom and she agreed. The Guardian Ad Litem testified that she did not observe any ashtrays in the house and that environment was not bad for the children. We note the weight to be given to the evidence and the credibility of the witnesses are issues for the trier of fact. *State v. Jamison*, 49 Ohio St.3d 182, 552 N.E.2d 180 (1990). In short, the trial court, as trier of fact, clearly believed appellee's testimony that there was no longer smoking in the house. The trial court, in its September 26, 2011, Final Entry Decree of Divorce, never mentioned the dangers of second hand smoke.

{¶36} Moreover, while Dr. Everly testified at length regarding the dangers of second and third hand smoke, he never examined appellee's house for indications of heavy smoking and never examined the children in this case. The medical records that were submitted to him for review did not mention smoke exposure. As is stated above, while he spoke with appellant, he never spoke to appellee.

{¶37} Appellant also maintains that the trial court erred in granting appellee custody due to his work schedule. According to appellant, due to his work schedule, appellee could not personally care for the children a majority of the time and had to rely on his mother and sisters to take care of his children. Appellant maintains that her work schedule allows her to personally care for the children during the school year and that only on occasion would she need the assistance of another person to care for the children during working hours.

**{¶38}** However, there was testimony from Heather Smith that appellee was very active in his children's lives and had assisted in school parties and events. There was testimony that he coached his daughter's soccer team and that he attended parent-teacher conferences and checked homework on a regular basis. As a result of appellee's efforts, his one daughter is reading at an advanced grade level. In contrast, Smith testified that appellant, over the previous year, had never attended parent-teacher conferences or participated in the children's extracurricular activities. As noted by the trial court in its decision:

**{¶39}** "During the period of time in the father's care, the father has had a positive impact on the girls. He has been attentive to parenting them. He attends school functions, checks and signs homework and helps with school parties. Father will leave work early in order to attend both school functions and McKenzie's soccer game, which he coaches. He promotes good reading habits by having McKenzie read daily."

**{¶40}** Based on the foregoing, we find that the trial court did not abuse its discretion in designating appellee the residential parent. The trial court's decision was not arbitrary, unconscionable or unreasonable.

**{¶41}** Appellant's sole assignment of error is, therefore, overruled.

**{¶42}** Accordingly, the judgment of the Stark County Court of Common Pleas, Domestic Relations Division, is affirmed.

By: Edwards, J.

Delaney, P.J. and

Gwin, J. concur

_____

_____

_____

                                     JUDGES

JAE/d0614

[Cite as *Schoolcraft v. Schoolcraft*, 2012-Ohio-4148.]

IN THE COURT OF APPEALS FOR STARK COUNTY, OHIO

FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| BENJAMIN SCHOOLCRAFT | : | |
| | : | |
| Plaintiff-Appellee | : | |
| | : | |
| | : | |
| -vs- | : | JUDGMENT ENTRY |
| | : | |
| MELANIE SCHOOLCRAFT | : | |
| | : | |
| Defendant-Appellant | : | CASE NO. 2011CA00240 |

For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Stark County Court of Common Pleas, Domestic Relations Division, is affirmed. Costs assessed to appellant.

_____

_____

_____

JUDGES